[Crim. No. 3646. Second Dist., Div. Three. Apr. 28, 1943.]

THE PEOPLE, Respondent, v. ISIDRO E. RODRIGUEZ, Appellant.

Ben Van Tress for Appellant.

Earl Warren, Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Respondent.

SHINN, Acting P. J.—Defendant was tried by the court without a jury, convicted of robbery, which at the time of sentence was reduced by the court to grand theft from the person, was sentenced to the state prison, and appeals. He raises no question as to the sufficiency of the evidence to support the verdict. The conviction rests in part upon a confession of the defendant allegedly made to a police officer. Evidence of the confession was received without any effort to prove that it was made voluntarily, and in disregard of the

defendant's testimony that he was beaten by police officers in an effort to make him confess. For this reason the judgment must be reversed.

Before discussing the use of the confession under these circumstances, we shall give attention to an irregularity in the presentation of the case of the People which should not be allowed to pass unnoticed, even though it may not of itself necessitate a reversal.

A brief statement of the case will suffice for an examination of the legal questions involved, if, indeed, they could be so denominated.

The prosecuting witness, Dellinger, frequently referred to in the evidence as "the old man," testified that after he and defendant, aged 21, had been drinking together at a "beer joint" on Valley Boulevard near the town of Puente, he undertook to drive the defendant to the latter's home; that as they were driving through the San Gabriel wash in brushy country, defendant asked that the car be stopped so he could alight, told him that he had a "bunch of glass" in his tires, asked him to get out and look at it, and attacked him with his fists, blacking his eyes, cutting his face and head, breaking his glasses and knocking him down and out; that defendant abstracted a wallet from his pocket, containing $200 and a "21-year life membership" card in the Elks Lodge, and disappeared in the brush; that the Elks card was never returned to him, but the following day a deputy sheriff returned to him $190.90, which had been found upon the person of the defendant when he was arrested.

Defendant's version of the occurrence was that he had been shooting dice with Dellinger during their drinking; that Dellinger started to drive him home; that they stopped in the wash in order to resume their dice game; that he won all of Dellinger's money; that the latter accused him of cheating and attacked him, and that he used upon Dellinger only the force necessary to defend himself against the attack. He testified that he won altogether from defendant about $90; that he had $120 when he left home that morning. Defendant, his mother and sister testified that he had received $100 from his mother in cash to deposit in bank, and defendant testified that this was the money that was taken from him by the officer. There was some evidence that while the parties were drinking, defendant had paid for drinks with a $20 bill. It appears that Dellinger was rather thoroughly intoxicated.

In the People's case in chief, one Bletcher, a deputy sheriff, testified that defendant had accompanied officers to the wash, identified the location as the one where the altercation had taken place, had directed a search for the wallet, had reached into a hole during the search but that the wallet had not been found. All of this took place after the officer had stated to defendant that it would do no one any harm if the Elks card were returned to Dellinger, that the card meant a lot to him and that Dellinger ''wasn't going to harm nobody.'' The testimony was objected to upon the ground that defendant's statements under the circumstances would not have been voluntary, permission was requested to place defendant upon the stand to prove that any statements he made were involuntary; this permission was denied and the objection was overruled. Because of a more serious error, to be presently discussed, we find it unnecessary to consider whether defendant's statements upon the occasion of the visit to the wash amounted to a confession or, if they did, whether the previous statements of the officer to him were such as would have rendered involuntary any confession which they may have induced.

In the cross-examination of defendant he was asked whether he had not given to Officer Story a complete account of having beaten and robbed Dellinger as the latter claimed, and he denied having made any such statements. After the defense had rested, Officer Story was called and testified to a complete and detailed confession made by defendant shortly after he had been booked following his arrest.

Defendant had testified repeatedly that he had been beaten by the officers shortly after his arrest, that Officer Story was questioning him in room 338 of the jail building at the time of the beating, that he promised to take the officers to the scene of the alleged robbery and to confess ''to any crime in the United States'' if they would cease beating him. He was asked by his counsel to name the other officers who were present at the beating, the district attorney objected to the question and, although the court appears not to have ruled on the objection, the question was not answered. Defendant again denied having made any of the statements to which Story testified.

The alleged confession to Officer Story was not offered as a part of the People's case in chief. It was held back, to be offered in rebuttal and in the guise of impeachment of defendant after his denials upon cross-examination. Apparently both counsel and the court considered this to be·a proper

procedure. Not only that, but it appears to have been assumed that a confession elicited by way of impeachment was admissible without proof that it had been given voluntarily. The procedure was entirely wrong. If the defendant had confessed, proof of the confession was a part of the case of the People and it was the duty of the district attorney to offer it before resting his case, when the testimony was then available and there was no reason for not offering it in chief. When the case of the People is closed and the defense is in, the remainder of the People's case is limited to evidence in rebuttal of that produced by the defense and should be so limited by the court, except where a proper showing is made for reopening the case in chief for the receipt of further evidence. The People have no right to withhold a material part of their evidence which could as well be used in their case in chief, for the sole purpose of using it in rebuttal. Evidence as to statements of the accused tending to show his guilt was admissible to establish the truth of the facts stated. Evidence offered to show contradictory statements of a witness or to otherwise impeach him is received because it bears upon the credibility of the witness and not for the purpose of proving the truth of the statements which are contradictory of the witness' sworn testimony. The alleged confession was offered to establish facts constituting guilt; the impeachment feature was incidental and comparatively unimportant. It was no more proper for the district attorney to offer the evidence as rebuttal after defendant's denial of the alleged statements, under the pretense that it was offered to impeach the defendant, than it would have been to offer it in rebuttal if the defendant had not been questioned about it at all. It makes no difference here that the testimony as to the confession, aside from being evidence of the fact of guilt, also tended to impeach the defendant. (*People* v. *Yeaton,* (1888) 75 Cal. 415 [17 P. 544].) The practice of allowing the district attorney to withhold a part of his case in chief and to offer it after the defense has closed cannot be approved, but the obvious error in permitting that procedure does not appear to have been prejudicial in this instance and is not the vital one involved.

The error which demands a reversal is that the defendant's conviction rests in part upon evidence of his confession which was received under circumstances which rendered it inadmissible. The principle that a confession of one charged with crime cannot be used against him if it was

not made voluntarily is as firmly established and as jealously upheld by the courts as any rule or principle of criminal law or procedure. It is axiomatic that the use of external means of pressure, whether by threats, intimidation or the promise or holding out of the hope of immunity or reward, or by any like means tending to induce the accused to admit guilt is opposed to public policy. Such means of coercion or persuasion cast such doubt upon the voluntary nature of the confession as to condemn it altogether. Both the district attorney and the court have an affirmative duty so to use their respective authority and power as to make certain that through no fault or omission on their part may a defendant be deprived of his guaranteed right to a legal, fair, and impartial trial. It is the duty of the district attorney not to make use of an alleged confession until he has satisfied himself through his own investigation that it was made voluntarily. It is the duty of the court to require satisfactory proof of the voluntary character of a confession before allowing it to be placed in evidence. These principles are elementary. There is always an opportunity for an inquiry as to whether unlawful means have been employed to obtain a confession when it is sought to use it in court and whenever the voluntary nature of the alleged confession is subject to reasonable doubt, the matter should be made the subject of a fearless and thorough investigation by the district attorney or, if he fails in his duty, by the court. It is within their power to do more towards suppressing the use of third-degree methods and all forms of brutality upon prisoners than all other agencies combined can do.

The testimony of the defendant, a young Mexican laborer, that he had been beaten by the officers during his interrogation and before he was taken to the scene of the alleged crime appears to have aroused no interest upon the part of the district attorney or the court. In fact the former by his objection disclosed that he thought it to be out of order to ascertain the names of the officers who administered the alleged beating. Neither Officer Story nor any other witness was questioned as to the truth of defendant's testimony regarding the beatings, nor was any effort whatever made to prove that the alleged confession was voluntary.

Defendant's testimony as to mistreatment by the officers made so little impression upon the district attorney that he was not even cross-examined upon the subject. Perhaps such

complaints have become so frequent that it would be a great burden to investigate all of them; but if they are so frequent, may that not be because they are often true? This we cannot know, but we do know that the uncovering of a single case of the beating of a prisoner would compensate for many unsuccessful efforts in that direction.

 Counsel for defendant did not object to the testimony of Officer Story as to the confession upon the ground that there was no showing that it was voluntary, but on the grounds that it was incompetent, irrelevant and immaterial and no foundation laid (for impeachment). The failure to make a timely and sufficient objection is of no moment where a grave matter of public policy is involved. Counsel for the defense do not bear the entire burden of protecting the constitutional rights of their client. Where those have been invaded, as they appear to have been here, and the opportunity arises on appeal to undo the wrong, the court cannot allow itself to be hampered by the failure of counsel to register an objection. Undoubtedly a defendant can waive a constitutional right, but where the alleged waiver is of the right to exclude a confession obtained by illegal means, we are not willing to accept less than an express waiver, at least not one arising from mistake and inadvertence.

 In what we have to say as to the gravity of the failure to observe the rights of a defendant whose confession is used against him, it will be necessary to consider also whether the use of a confession which has been obtained by police officers through illegal means is of itself a miscarriage of justice which requires a reversal of the conviction. In the early case of *People* v. *Barric,* (1874) 49 Cal. 342, in condemning the use of a confession induced by a statement made to the defendant by or in the presence of the sheriff, ''It will be better for you to make a full disclosure,'' the court said (p. 345): ''The rule is without exception that such a promise made by one in authority will exclude a confession. Public policy absolutely requires the rejection of confessions obtained by means of inducements held out by such persons.''

In *White* v. *Texas,* (1940) 310 U.S. 530 [60 S.Ct. 1032, 84 L.Ed. 1342], it was held that the use of a confession obtained by force and fear and ''upon which the State's case substantially rests,'' was a deprivation of due process.

In *Chambers* v. *Florida,* (1940) 309 U.S. 227, [60 S.Ct. 472, 84 L.Ed. 716, the court, in denouncing the use of a confession

obtained by illegal means, said (p. 724): "Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death. No higher duty, no more solemn responsibility, rests upon this Court, than that of translating into living law and maintaining this constitutional shield deliberately planned and inscribed for the benefit of every human being subject to our Constitution—of whatever race, creed or persuasion."

In *Brown* v. *Mississippi*, (1936) 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682, it was held that the use of a confession obtained by force and fear was a clear denial of due process. The court, speaking through Mr. Chief Justice Hughes, then said (p. 687): "It is in this view that the further contention of the State must be considered. That contention rests upon the failure of counsel for the accused, who had objected to the admissibility of the confessions, to move for their exclusion after they had been introduced and the fact of coercion had been proved. It is a contention which proceeds upon a misconception of the nature of petitioners' complaint. That complaint is not of the commission of mere error, but of a wrong so fundamental that it made the whole proceeding a mere pretense of a trial and rendered the conviction and sentence wholly void. (*Moore* v. *Dempsey*, 261 U.S. 86, 67 L.Ed. 543, 43 S.Ct. 265, *supra*.) We are not concerned with a mere question of state practice, or whether counsel assigned to petitioners were competent or mistakenly assumed that their first objections were sufficient."

The foregoing cases are authority for the statement that one who has been convicted of a crime upon evidence which consists wholly or in substantial part of his confession which has been procured by officers of the law by means of force or violence has been convicted without due process of law.

Defendant was not questioned at all as to the circumstances or details of the alleged beatings and it cannot be determined to what extent, if at all, force was used upon the defendant by the officers or whether he was put in fear by their treatment to which he testified. The record is silent on the subject except for the testimony of the defendant and we do not see how the trial judge could have known more than is disclosed by the record. In summing up the case before finding defendant guilty, the judge said: "As far as the confessions are concerned, this man denies everything that he ever

told these officers, anything which incriminated him or gave them any information as to the location of this purse or anything of the kind, so as far as the beatings, which he received, if he did receive them, they had no effect on him whatever to produce results.'' And yet if the officer was to be believed, defendant confessed to the crime at the time when, as he testified without contradiction, he was being subjected to beatings. Without any testimony from the defendant it would have been error to admit the confession. If his testimony was disbelieved, it was still error to admit it without affirmative proof that it was voluntary. If defendant was to be believed, then the confession testified to by Officer Story was obtained illegally and was not admissible at all. The fact that defendant denied having made the confession does not cure or mitigate the error in allowing it to be used and has no bearing upon the questions of legality and public policy that are involved. (*White* v. *Texas, supra,* 310 U.S. 530 [60 S.Ct. 1032, 84 L.Ed. 1342].)

The uncertainty as to the facts surrounding the interrogation of defendant by the officers results from the failure of the district attorney and of the court to inquire into the truth of defendant's charges. Had such inquiry been made, and had the confession then been received, we would have the benefit of the court's implied finding that defendant's testimony was untrue and there no doubt would be some evidence in the record tending to show that it was made voluntarily. But we have no such record.

The question before us is not the one decided by the Supreme Court of the United States in the cases cited above, namely, whether defendant was denied due process. The confessions which had been used in those cases were clearly shown to have been extorted from the respective defendants. The evidence here does not go that far. But we are not in a position to say, and we think the trial court could not have said, from all that transpired at the trial, that defendant had not been so grievously mistreated by the officers as to render the use of a confession obtained thereby a denial of the constitutional right of due process. The case is one where the constitutional right of the defendant may have been violated and where it was the manifest duty of the trial court to determine whether there had been such violation. This brings us to the question whether the use of the confession under the circumstances resulted in a miscarriage of justice. We are definitely

of the opinion that it did. The inquiry is not as to whether the guilt of the defendant was established but as to the methods by which the finding of guilt was reached. As was said by Mr. Presiding Justice Conrey in *People* v. *Wilson,* (1913) 23 Cal.App. 513 [138 P. 971], at 524, ''The phrase, 'miscarriage of justice,' does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused in a given case to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time illegally deprive them of life or liberty. 'It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure, in which the substantial rights belonging to defendants shall be respected.' (Opinion written by Mr. Justice Sloss in *People* v. *O'Bryan,* 165 Cal. 55, [130 P. 1042].)''

The record before us illustrates how easily departure from established procedure may lead to the impairment of substantial rights.

We find particularly appropriate in this connection remarks of former Chief Justice Bleckley of the Supreme Court of Georgia, delivered to the Georgia Bar Association and printed in its annual report (1886) as follows: ''Some meritorious cases, indeed many, are lost in passing through the justice of procedure; but they are all justly lost, provided the rules of procedure have been correctly applied to them. That a just debt is unrecognized, a just title defeated, or a guilty man acquitted, is no evidence that justice has not been done by the Court or the jury. It may be the highest evidence that justice has been done, for it is perfectly just not to enforce payment of a just debt, not to uphold a just title, not to convict a guilty man, if the debt, or the title, or the guilt be not verified. It is unjust to do justice by doing injustice. A just discovery cannot be made by an unjust search. An end not attainable by just means is not attainable at all; ethically, it is an impossible end. Courts cannot do justice of substance except by and through justice of procedure. They must not reach justice of substance by violating justice of procedure. They must realize both, if they can, but if either has to fail, it must be justice of substance, for without justice

of procedure Courts cannot know, nor be made to know, what justice of substance is, or which party ought to prevail. As well might a man put out his eyes in order to see better, as for a court to stray from justice of procedure in order to administer justice of substance.''

It cannot be doubted for a moment that a conviction which rests in substantial part upon the use of a confession obtained illegally by police officers is a miscarriage of justice. A conviction also results in a miscarriage of justice where a defendant's alleged confession is used against him without any evidence to prove that it was made voluntarily, where the defendant has testified without contradiction that he was beaten by police officers during his interrogation and where the district attorney and the court have made no inquiry as to the truth of the defendant's charges or as to the circumstances under which or the means by which the confession was obtained.

The judgment and order are reversed, and the cause is remanded for retrial.

Wood (Parker), J., and Shaw, J. pro tem., concurred.